**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| **THE ESTATE OF REGO BERTO ORNELAS JR., Deceased, by and through N.J.O., a minor, who also sues Individually, by and through her mother and next friend, MELANIE VASQUEZ; and RACHEL ORNELAS, Individually,** | § | **CIVIL ACTION NO. 3:26-cv-00376** |
| **Plaintiffs,** | § | **JURY TRIAL DEMANDED** |
| **v.** | § | |
| **CITY OF TEXAS CITY, TEXAS; LANDIS CRAVENS, in his individual capacity; DEANDRA L. MOORE, in her individual capacity; ANDREW S. PARLER, in his individual capacity; HUNTER C. MCINERNEY, in his individual capacity; GEOFFREY A. MILILLO, in his individual capacity; and JOHN P. PICARD, in his individual capacity,** | § | |
| **Defendants.** | § | |

---

**PLAINTIFFS' ORIGINAL COMPLAINT**

---

COMES NOW Plaintiffs the Estate of Rego Berto Ornelas Jr., Deceased, by and through N.J.O., a minor, who also sues Individually, by and through her mother and next friend, Melanie Vasquez; and Rachel Ornelas, Individually (collectively, “Plaintiffs”), and for their *Original Complaint* against Defendants City of Texas City, Texas; Landis Cravens, in his individual capacity; DeAndra L. Moore, in her individual capacity; Andrew S. Parler, in his individual capacity; Hunter C. McInerney, in his individual capacity;

Geoffrey A. Milillo, in his individual capacity; and John P. Picard, in his individual capacity (collectively, “Defendants”), respectfully show the Court as follows:

## I. INTRODUCTION

1. This is a civil action under 42 U.S.C. § 1983 for the death of Rego Berto Ornelas Jr., who died on Monday, October 28, 2024, in the custody of the Texas City Police Department (“TCPD”) after being detained at Biosphere Recycling, 3301 Loop 197 North, Texas City, Texas.

2. TCPD officers found Mr. Ornelas profusely sweating, screaming, and incoherent, restrained him, and transported him, handcuffed and unseatbelted, toward jail rather than to a hospital.

3. Over the following approximately 23 minutes, TCPD officers observed Mr. Ornelas's condition continue without any lucid interval. When the Galveston County Jail's own medical staff refused to accept him and recommended a fitness-for-incarceration evaluation 0.4 miles away, the supervising sergeant directed that Mr. Ornelas remain in the sally port until a restraint device arrived from Texas City, with the hospital transport to follow. Mr. Ornelas went into cardiac arrest shortly thereafter.

4. The Galveston County Medical Examiner determined that Mr. Ornelas died of toxic effects of methamphetamine.

5. More than four years earlier, on February 11, 2020, Raven Vaughn died in the Texas City Jail, also of acute methamphetamine toxicity, after TCPD personnel watched

him shake and sweat profusely for nearly an hour without summoning emergency medical care. Galveston County Medical Examiner Case No. ME-01-2020-086.

6. Forty-three days after Mr. Ornelas's death, on December 10, 2024, another man, Derrick Dwayne Glenn, died in TCPD custody after officers, with the same sergeant who supervised Mr. Ornelas's arrest and transport on scene, waited for EMS while Mr. Glenn, who had placed an object in his mouth during a pedestrian stop, lost consciousness from an obstructed airway.

7. At least three people died in TCPD custody between February 2020 and December 2024. Each was a detainee in visible medical distress.

8. A separate action arising from Mr. Glenn's death, *Estate of Derrick Dwayne Glenn, et al. v. City of Texas City, Texas, et al.*, will be filed in the Galveston Division of this Court. The two actions arise from the same police department, involve a common supervising officer, Defendant Picard, and a common defendant, the City of Texas City. Plaintiffs will file a Notice of Related Case in this action once the Glenn action is filed.

9. Plaintiffs bring claims under the Fourteenth Amendment to the United States Constitution against the individual officers, against former Chief of Police Landis Cravens, and against the City of Texas City, and seek the damages available to the Estate of Rego Berto Ornelas Jr. and to his statutory wrongful death beneficiaries under 42 U.S.C. §§ 1983 and 1988.

10. Where this ***Complaint*** pleads alternative theories, it does so under Federal Rule of Civil Procedure 8(d), and no allegation in one count is an admission against another.

## II. JURISDICTION AND VENUE

11. This action arises under the Constitution and laws of the United States, including the Fourteenth Amendment and 42 U.S.C. §§ 1983 and 1988. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

12. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims occurred in Galveston County, Texas, and under § 1391(b)(1) because Defendant City of Texas City is located in this district and, on information and belief, each individual Defendant resides in this district.

13. Venue is proper in the Galveston Division because the events giving rise to this action occurred in Texas City and unincorporated Galveston County, Texas.

14. All conditions precedent to the filing of this action have been satisfied. Defendant City of Texas City received actual notice of Plaintiffs' claims within the meaning of Tex. Civ. Prac. & Rem. Code § 101.101(c) within six months of Mr. Ornelas's death. Specifically, the Texas City Police Department's own incident report and supplemental officer reports – entered by Officer Moore and each individual Defendant on October 28 and 29, 2024, and retained by the City in the ordinary course – documented the use of force against Mr. Ornelas, his transport unsecured by a seatbelt, the Galveston County Jail's refusal to accept him pending a medical fitness evaluation, and his death following an unaddressed medical emergency, giving the City contemporaneous, subjective awareness that TCPD conduct may have caused or contributed to his death. This is independently confirmed by the City's own Custodial Death Report for Mr. Ornelas, submitted to the Office of the

Attorney General on December 12, 2024 – within six months of the death – in which the City stated that Mr. Ornelas "was denied entry during booking and jail staff advised he required a medical fit for incarceration," and that "[w]hile the male was being returned to the patrol unit a medical episode happened."

15. In any event, Plaintiffs' claims under 42 U.S.C. § 1983 are not subject to, and may not be conditioned upon compliance with, the Texas Tort Claims Act's notice requirement. *Felder v. Casey*, 487 U.S. 131, 140–41 (1988) (agreeing with the "near-unanimous conclusion of the federal courts" that notice-of-claim provisions are inapplicable to § 1983 actions brought in federal court).

## III. PARTIES

16. Plaintiff N.J.O. is a minor residing in Texas. She is a surviving daughter of Rego Berto Ornelas Jr., deceased. She sues individually and on behalf of the Estate of Rego Berto Ornelas Jr., by and through her mother and next friend, Melanie Vasquez, pursuant to Federal Rule of Civil Procedure 17(c).

17. Rego Berto Ornelas Jr. died on October 28, 2024. He was never married. The Estate of Rego Berto Ornelas Jr. brings the survival claims by and through his daughter, N.J.O., by and through her mother and next friend, Melanie Vasquez.

18. Plaintiff Rachel Ornelas is an individual residing in Texas. She is the surviving mother of Rego Berto Ornelas Jr., deceased, and sues individually as a statutory wrongful death beneficiary under Tex. Civ. Prac. & Rem. Code § 71.004.

19. Defendant City of Texas City, Texas ("the City") is a municipal corporation organized under the laws of the State of Texas, located within Galveston County and

within this judicial district. The City may be served with process through its Mayor, Abel Garza Jr., 1801 9th Avenue North, Texas City, Texas 77590, or wherever he may be found.

20. Defendant Landis Cravens is an individual who served as Chief of Police of the Texas City Police Department from August 2023 until May 2026. He is sued in his individual capacity. He may be served at [ADDRESS PENDING], or wherever he may be found.

21. Defendant DeAndra L. Moore is an individual who was employed as a police officer by the Texas City Police Department on October 28, 2024. She is sued in her individual capacity. She may be served at her current place of employment, the METRO Police Department, 1900 Main Street, Houston, Texas 77002, or wherever she may be found.

22. Defendant Andrew S. Parler is an individual employed as a police officer by the Texas City Police Department. He is sued in his individual capacity. He may be served at the Texas City Police Department, 1004 9th Avenue North, Texas City, Texas 77590, or wherever he may be found.

23. Defendant Hunter C. McInerney is an individual employed as a police officer by the Texas City Police Department. He is sued in his individual capacity. He may be served at the Texas City Police Department, 1004 9th Avenue North, Texas City, Texas 77590, or wherever he may be found.

24. Defendant Geoffrey A. Milillo is an individual who was employed as a police officer by the Texas City Police Department on October 28, 2024. He is sued in his

individual capacity. He may be served at his current place of employment, the Dickinson Police Department, 4000 Liggio Street, Dickinson, Texas 77539, or wherever he may be found.

25. Defendant John P. Picard is an individual employed as a sergeant by the Texas City Police Department. He is sued in his individual capacity. He may be served at the Texas City Police Department, 1004 9th Avenue North, Texas City, Texas 77590, or wherever he may be found.

## IV. FACTUAL ALLEGATIONS

26. Defendant Landis Cravens became Chief of Police of the Texas City Police Department on August 16, 2023, succeeding Chief Joe Stanton, under whom he had served as Assistant Chief. He was Chief of Police at the time of Mr. Ornelas's death and of the Risk Analysis Board review described below. He left the Department in May 2026.

### *A. The Biosphere Arrest*

27. On October 28, 2024, at 6:23 a.m., TCPD dispatch received a call, and at 6:25 a.m. Officer DeAndra L. Moore was dispatched to a suspicious-person call at the Biosphere Recycling facility, 3301 Loop 197 North, Texas City, Texas, in response to a report of a male voice screaming “Jesus help” from the rear of the property. Dispatch coded the event, Event ID 2024-586948, as “Suspicious Circ Person,” priority 2, no medical priority. The incident is documented in TCPD Incident/Investigation Report, Case No. 24-007260.

28. The City's records do not identify the officers consistently. Officer Moore's report identifies her as “OFC. D Moore #8140” in its opening paragraph and is signed “OFC D. Moore #4401.” The dispatch log uses 8140 as the identifier for Officer Moore's unit, 8189 for Officer Parler, and 8116 for Sgt. Picard, whose reports are signed “A. Parler #3076” and “Sgt. J. Picard #2901.” Sgt. Picard's supplement identifies Officer Moore's vehicle as “unit 02.”

29. Officer Moore located Mr. Ornelas walking and stomping aimlessly, screaming and yelling “Jesus.”

30. Mr. Ornelas repeatedly went down onto his hands and knees, got back up, and resumed stomping around while screaming. He moaned. He rolled on the ground, alternating between lying on his stomach and on his back.

31. At times Mr. Ornelas responded to a question, only for his next statement to be nonsensical.

32. Officers Andrew S. Parler and Hunter C. McInerney arrived and heard the yelling.

33. Officer Parler recognized Mr. Ornelas from prior encounters and knew him to use narcotics.

34. Officer Parler's supplemental report states that he asked Mr. Ornelas what he had smoked. Mr. Ornelas responded, “nothing, they gave me something.” When Officer Parler asked what they gave him, Mr. Ornelas responded, “nothing,” and when asked what the stuff looked like, he stated, “the regular stuff.”

35. Officer McInerney's supplemental report states that Mr. Ornelas replied, “I smoked nothing they gave me something earlier,” and, when asked what the stuff looked

like, “just the regular type of stuff.” Officer McInerney added that Mr. Ornelas “failed to go further into detail of what stuff he had taken.”

36. Officer Moore's report states that she heard Officer Parler ask Mr. Ornelas what he smoked and that Mr. Ornelas “responded that they gave him something.” When Officer Parler asked what they gave him, Officer Moore wrote, “he answered incoherently.”

37. Three TCPD officers therefore heard Mr. Ornelas say that someone had given him something earlier. None of their reports records that any officer learned what the substance was or how it had been taken.

38. Officer Parler wrote that Mr. Ornelas “appeared to be drenched in sweat, which is a common side effect of narcotics.”

39. Officer Parler wrote that, based on his training and experience, Mr. Ornelas's “erratic behavior, his profuse sweating, and his rambling statements” led him to believe that Mr. Ornelas “was under the influence of narcotics to the point where he was a danger to himself or others.”

40. Officer McInerney wrote that Mr. Ornelas “appeared disoriented and intoxicated, yelling random statements,” and was “soaked in what is believed to be sweat.”

41. Officers Moore, Parler, and McInerney each documented in their own reports that Mr. Ornelas appeared intoxicated or under the influence of a drug.

42. Officers Moore, Parler, and McInerney report that, as they attempted to detain him, Mr. Ornelas resisted and wrapped his arm around Officer Moore's leg. Officers Parler and McInerney report that he appeared to be attempting to bite her.

***B. The Use of Force and Continued Resistance***

43. Officer Parler delivered two closed-fist strikes to the left side of Mr. Ornelas's head, near his ear, which his report describes as delivered "in order to gain pain compliance." Mr. Ornelas released Officer Moore's leg after the second strike.

44. Sgt. Picard's supplement records that Officer Parler told him he "delivered two closed-hand strikes to the right side of Rego's head area." The City's own reports do not agree on which side of Mr. Ornelas's head Officer Parler struck.

45. The Galveston County Medical Examiner's autopsy report, Case No. ME-01-2024-826, documented focal hemorrhage of the left temporalis muscle and focal left temporal subscalp hemorrhage, on the side of the head where Officer Parler's and Officer McInerney's supplements place the strikes.

46. Officer Geoffrey A. Milillo arrived and, with Officer Parler, placed Mr. Ornelas in the recovery position. Mr. Ornelas began apologizing repeatedly and stated, "thank you brother," multiple times.

47. Officer Milillo asked Mr. Ornelas whether he had taken anything and told him to let officers know so that EMS could be contacted if needed. Mr. Ornelas stated that he had not.

48. Officer Parler's supplement states that Officer Milillo "was also asking Rego what he had taken and if he needed EMS," but that Officer Parler "was unable to hear Rego's responses."

49. Officer McInerney double-locked Mr. Ornelas's handcuffs.

50. Officers J. Fraga and C. Cargile arrived as Mr. Ornelas was being placed into the rear seat of Officer Moore's patrol unit; per their own joint supplement, they “cleared the scene” immediately after, without independently assessing his condition or requesting medical attention.

51. Sgt. Allen Edinburgh arrived at the scene after Mr. Ornelas had been placed in the rear seat of Officer Moore's patrol unit, and his supplement states that he then cleared the scene.

52. In total, seven Texas City police officers – Moore, Parler, McInerney, Milillo, Edinburgh, Fraga, and Cargile – were present at the Biosphere scene while Mr. Ornelas was there. None called EMS.

53. At 6:39 a.m., while officers were detaining Mr. Ornelas, Officer Robert E. Lizik and Sgt. Picard each set out to retrieve the WRAP restraint device for the Biosphere scene. At 6:43 a.m., after Mr. Ornelas had been placed in Officer Moore's patrol unit, Officer Parler radioed: “following 40 to jail, disregard wrap.”

***C. The Transport***

54. Mr. Ornelas was placed in the rear of Officer Moore's patrol unit, handcuffed behind his back. Officer Moore's own supplement admits: “It was my responsibility to verify that my subject was secured, but I failed to do so.” Officer Parler's supplement states that he shut the rear door and that, “[d]ue to Rego's behavior, he was not secured with a seat belt.”

55. Officer Moore's report states that, before transport, she notified dispatch that she was going to transport Mr. Ornelas “to Texas City jail for public intoxication and resisting arrest.”

56. Officer Moore's report also states that Officer Parler had explained to her that Mr. Ornelas “was high on something, which informed me it was due to some drug.”

57. The patrol unit's interior camera documents Mr. Ornelas kicking the roof and sides of the vehicle, inverted, and screaming throughout the transport.

58. Officer Moore began transport toward the Texas City Police Department, notwithstanding Sgt. Picard's earlier radio instruction that Mr. Ornelas be taken directly to the Galveston County Jail.

59. Upon arriving at the Texas City Police Department at 6:49 a.m., Officer Moore exited her patrol vehicle, leaving Mr. Ornelas alone and unattended in the rear of the vehicle while she proceeded to place her firearm in the safe box.

60. Sgt. Picard, monitoring Officer Moore's location by mobile computer terminal, observed that she had arrived at the Texas City Police Department rather than the Galveston County Jail. He contacted her and reiterated that Mr. Ornelas was to be transported directly to the Galveston County Jail.

61. Officer Moore then returned to her patrol vehicle and, at 6:51 a.m., drove directly to the Galveston County Jail, approximately 14 miles away.

62. No Texas City police officer summoned EMS at any point during the transport.

***D. The Sally Port and Cardiac Arrest***

63. Unit 02 arrived at the Galveston County Jail sally port at approximately 7:09 a.m. Officer Moore's report states that, when Mr. Ornelas was removed from her vehicle, she observed red bruising on the front and side of his head and bleeding around his nose, and that he had no bruising or lacerations to his face or head when he was placed in her vehicle.

64. Jailers brought out a black cart that Sgt. Picard's supplement describes as "used for combative prisoners," and Mr. Ornelas was placed in it.

65. The jail nurse refused intake and directed a fitness-for-incarceration evaluation at the University of Texas Medical Branch ("UTMB"), 0.4 miles away.

66. Officer Moore told the nurse that Mr. Ornelas was "out of it like that" when she first observed him.

67. When the nurse asked Officer Moore how Mr. Ornelas sustained his facial injuries, Officer Moore told her that he had injured himself in the patrol vehicle during transport.

68. Officer Moore called Sgt. Picard and told him that the jail would not accept Mr. Ornelas without a fit for incarceration from UTMB. Sgt. Picard directed Officer Parler to bring the WRAP restraint device from Texas City to the Galveston County Jail, to be applied before Mr. Ornelas was transported to UTMB. Dispatch logged the instruction at 7:21 a.m.: "8116 adv for 8189 to grab the wrap and be enrt to co jail and then transport to UTMB for fit." Neither Sgt. Picard nor Officer Moore summoned EMS.

69. On information and belief, and as recognized in emergency medicine, acute methamphetamine toxidrome with severe hyperthermia is a time-sensitive medical emergency in which the interval between onset and treatment directly affects the likelihood of survival, and the standard of emergency medical care for this condition calls for prompt transport to a facility capable of providing active cooling and supportive care.

70. At 7:21:21 a.m., Officer Moore told jail staff, "I'd take him to get a FIT but I gotta wait for Cargile to bring the WRAP because he's gonna be throwin himself all over".

71. Officer Moore's statement identifying Officer Cargile as the officer bringing the WRAP device conflicts with Sgt. Picard's own supplement, which states that he contacted Officer Parler to retrieve and bring the WRAP device to the Galveston County Jail.

72. While awaiting the WRAP device, Mr. Ornelas kicked violently and screamed continuously for the entire time he was in the pushcart, without any lucid or cooperative interval – the same behavior observed during the transport. Officer Moore stood nearby. No TCPD officer summoned EMS before Mr. Ornelas abruptly stopped moving and became unresponsive. Sgt. Picard's supplement records that Officer Moore told him that "while he was in the cart, she noticed him 'convulsing' and then moments later he stopped."

73. Approximately 23 minutes after the nurse's refusal, at 7:32:32 a.m., Mr. Ornelas stopped moving and became unresponsive. Officer Moore poked him with her flashlight and rubbed his chest with it, saying, "Hey Ricardo, hey, hey. You breathin

man?" "Ricardo" was not Mr. Ornelas's name; Mr. Ornelas had given Officer Moore his name at the Biosphere, and her report states that she called him by it there.

74. At 7:34:51 a.m., Officer Moore told two jail personnel standing nearby, "He's coding."

75. At 7:34:57 a.m., Officer Moore and a jail deputy pulled Mr. Ornelas off the pushcart onto the concrete floor and began CPR.

76. A jail nurse then arrived and took over CPR.

77. At 7:35:41 a.m., the nurse said, "Get me some Narcan."

78. At 7:35:46 a.m., the nurse said, "I need you to call code blue in the sally port."

79. "Code blue" is a standard medical emergency designation used to summon a resuscitation response for a patient in cardiac or respiratory arrest.

80. At 7:36:45 a.m., the nurse said, "No pulse."

81. Prior to the arrival of EMS, jail nursing staff administered a total of 8 milligrams of naloxone to Mr. Ornelas intranasally, after Mr. Ornelas's cardiac arrest, and not at any point at the direction of TCPD, as documented in the Galveston Area Ambulance Authority's Patient Care Record, Incident No. 202410027.

82. EMS arrived because Galveston County dispatch independently initiated the response, not because any Texas City police officer called 911.

83. EMS's own patient care record documents that Mr. Ornelas remained in asystole, a non-perfusing cardiac rhythm, from EMS's arrival at 7:43 a.m. through 7:55 a.m., notwithstanding advanced life support interventions including epinephrine,

intraosseous access, and mechanical CPR. EMS achieved return of spontaneous circulation at 7:59 a.m., but Mr. Ornelas lost pulses again shortly thereafter.

84. EMS's own patient care record identifies UTMB as the destination because it was the closest facility to the Galveston County Jail – the same hospital the jail nurse had already identified when she recommended a fitness-for-incarceration evaluation there before Sgt. Picard directed that Mr. Ornelas first await the restraint device.

85. At 7:44:27 a.m., Officer Moore told an EMT, “He was still kickin', still screamin', then he stopped. I said, ‘Ricardo, are you okay?’ And then I touched his hand and it was cold.”

86. At 7:50:17 a.m., Officer Moore told the EMT, “I don't know what overdose looks like, it's my first time.”

87. At 7:50:26 a.m., the EMT told Officer Moore, “His mouth was tight, and there was white stuff.”

88. At 7:50:59 a.m., Officer Moore told the EMT, “He was like that when I saw him, he was out of it.”

89. At 7:51:27 a.m., the EMT asked Officer Moore, “You guys carry Narcan right?” Officer Moore responded, “Yes.” The EMT told her, “If you see something like that you can give them Narcan, it's not going to hurt them.” Officer Moore responded, “OK.”

90. EMS transported Mr. Ornelas from the Galveston County Jail sally port to UTMB.

91. Mr. Ornelas was pronounced dead at UTMB at 8:30 a.m.

92. The Galveston County Medical Examiner, Case No. ME-01-2024-826, determined the cause of death to be toxic effects of methamphetamine. The autopsy report records that Mr. Ornelas had a rectal temperature of 107.5°F at the hospital.

93. Postmortem toxicology confirmed methamphetamine and its metabolites.

94. The autopsy further documented a ruptured plastic bag recovered from Mr. Ornelas's stomach.

### *E. The Sally Port After EMS Departed*

95. At approximately 8:08 a.m., before Mr. Ornelas was pronounced dead, Sgt. Picard's body-worn camera recorded him answering a phone call in the sally port as Officer Moore stood nearby. Sgt. Picard asked Officer Moore, “Did EMS Narcan him?” Officer Moore responded, “yes.” Sgt. Picard then relayed to the person on the call, “EMS narcanned him, looks like two of them.”

96. This account is contradicted by the Galveston Area Ambulance Authority's own patient care record, which documents that the naloxone was administered by jail nursing staff prior to EMS's arrival, not by EMS.

97. Sgt. Picard then asked Officer Moore, “Do you have CLEAT or TMPA?” Officer Moore answered, “I have TMPA.” Sgt. Picard told her, “He's gonna call you and talk to you OK?” Officer Moore responded, “Yeah, yeah.”

98. Sgt. Picard then told Officer Moore, “You can do that off camera over there,” and pointed to a locker in the corner of the sally port. Officer Moore, looking at her phone, walked toward the locker.

99. Officer Moore's body-worn camera documents her placing it in a sally-port locker on four separate occasions over the following ninety minutes – twenty-eight minutes and fifty-one seconds of darkened video in total – while she conferred with a TMPA-contracted attorney who later arrived and was personally escorted into the sally port by Officer Moore.

100. After Mr. Ornelas was pronounced dead, Sgt. Picard told Officer Moore, on camera: "He's deceased, you might wanna… call your rep and let him know he's deceased." Officer Moore again walked to the locker and deposited her body-worn camera.

***F. The Risk Analysis Board Review***

101. On June 17, 2025, the Texas City Police Department's Risk Analysis Board, chaired by Sgt. Jimmie Reynolds, reviewed the Ornelas matter and found that Officer Moore's conduct was not a policy violation. On the same worksheet, in handwriting: "EMS should have been called or Transported to Local Hospital." The Board's typed disposition memorandum states: "The board did note that EMS should have been called OR suspect should have been taken to a local hospital prior to going to the jail."

102. The Board's own written worksheet contains no completed findings on preventability or use-of-force classification; every substantive checkbox is blank, and no board recommendation is recorded.

103. The video-review table on the same worksheet lists body-camera footage of Officer Moore, Officer Parler and "PPO H. McInerney" (listed jointly), Officer Milillo, and

Sgt. Picard, and dash-camera video from Officer Moore's unit only. It does not list footage from Officers Fraga, Cargile, Chapa, or Martinez, or from Sgt. Edinburgh.

104. Captain James Patterson and Assistant Chief Manuel Johnson were both personally copied on the Board's disposition in June 2025. In May 2026, after Mayor Garza took office and the City parted ways with Chief Cravens, Captain Patterson assumed interim leadership of the Department.

105. The Board's disposition was transmitted to Chief Landis Cravens. The disposition memorandum is addressed “TO: Chief Landis Cravens” and states that the Board “recommends no further action be taken.” On information and belief, Chief Cravens reviewed and approved the disposition, did not overrule it, and took no corrective action. The records produced by the City reflect no discipline, retraining, or policy change arising from Mr. Ornelas's death.

### *G. The City's Records of Mr. Ornelas's Death*

106. The Texas City Police Department produced Sgt. Picard's and Officer Moore's body-worn camera footage blurred across the full frame, for the entire duration of each recording, while producing every other officer's footage from the same incident unblurred. The burned-in Axon timestamp overlay remains legible through the blur.

107. Officers Chapa and Martinez, and Sgt. Edinburgh, each stated in their own supplements that their body-worn camera footage had been submitted into the Axon Evidence system. That footage has not been produced in response to the Public Information Act requests made on the family's behalf.

108. Sgt. Picard's own supplement likewise states his in-car video was submitted; no such file has been produced.

109. No recording of the original 911 call or radio transmissions has been produced, despite the City's own computer-aided dispatch log confirming both exist.

110. The dispatch log records that at 8:06 a.m. on October 28, 2024, unit 8116, Sgt. Picard's unit, generated an additional report number, 24-007262. At 10:21 a.m., dispatch recorded: "PER 8109 THE SKELETON FOR 24-007262 WILL BE DELETED, EVERYTHING WILL BE DONE UNDER ONE CASE #/REPORT WHICH IS 24-007260."

111. The records produced by the City contain no report under number 24-007262. Eight months later, the Risk Analysis Board's worksheet listed the case under both numbers, "24-007260 / 24-007262," while the Board's typed disposition memorandum referenced only 24-007260. The dispatch log also records that the event was linked to two other events, Nos. 2024587066 and 2024587166, for which no records have been produced.

112. The City's Custodial Death Report for Mr. Ornelas, No. 24-1616-C, submitted to the Office of the Attorney General on December 12, 2024, departs from the City's own records in several respects: (a) it states that "[w]hile the male was being returned to the patrol unit a medical episode happened," while the officers' reports place Mr. Ornelas in the combative-prisoner cart in the sally port, awaiting the WRAP device, when he stopped moving; (b) it answers "Yes" to whether he had been receiving treatment for the medical condition that caused his death, while the officers' reports

record no medical treatment before CPR began; (c) it answers “No” to whether he exhibited mental health problems, while Officer Moore's report states that she asked whether he was a “119,” meaning whether he had mental health problems; and (d) it states that the medical examiner's results were pending, yet reports the means of death as “Drug overdose” caused by the “Decedent.” The medical examiner's autopsy report is dated December 13, 2024, the day after the City submitted its report.

### *H. The Death of Raven Vaughn in the Texas City Jail (2020)*

113. On February 10, 2020, TCPD Officer T. Hansen stopped a vehicle in the 3800 block of FM 1765 in Texas City and arrested its passenger, Raven Adriane Vaughn, age 29, on outstanding warrants and for possession of a controlled substance. TCPD Case No. 20-000915.

114. Officer Hansen's report states that he found in Mr. Vaughn's backpack “2 green diamond shaped pills, known to me by experience and training to be ecstasy (MDMA).”

115. Officer Hansen further reported: “I then weighed the suspected ecstasy at 0.4 grams. I utilized a Nark II Methamphetamine/ MDMA field test kit and yielded a positive field test result.”

116. Officer Hansen's report states that Mr. Vaughn “was transported, booked, and processed into the jail without incident.”

117. TCPD took Mr. Vaughn into custody at approximately 8:33 p.m. on February 10, 2020. According to the supplemental report of Officer C. Ham, he was brought into the Texas City Jail at approximately 9:23 p.m.

118. The TCPD reports produced to date reflect no medical screening of Mr. Vaughn at intake and no inquiry into whether he had taken or ingested any substance.

119. At approximately 12:05 p.m. on February 11, 2020, jail staff placed Mr. Vaughn in the arraignment room with two other detainees, identified here as J.G. and C.V., to await the magistrate.

120. TCPD Detective Jeffrey Winstead interviewed J.G. and C.V. that afternoon and recorded their accounts in a supplemental report entered at 3:59 p.m. on February 11, 2020.

121. Detective Winstead's supplement reports that C.V. “noticed that Vaugh[n] started breathing heavy and that he began to sweat” before the magistrate arrived.

122. The supplement reports that C.V. noticed that Mr. Vaughn's “pupils became dilated and that his breathing became more labored.”

123. The supplement reports that J.G. said Mr. Vaughn “began to have labored breathing and that he began to sweat,” and that “at one point Vaugh[n] removed his shirt and was wiping the sweat.”

124. The supplement reports that J.G. said Mr. Vaughn sat on the floor and that his “skin was kind of red in color.”

125. The supplement reports that C.V. said Mr. Vaughn "was having difficulty communicating with the judge," and that J.G. said Mr. Vaughn "was having problems communicating with the judge."

126. Both detainees asked Mr. Vaughn whether he was okay or needed help, and he told them he was okay.

127. A jailer came to the arraignment room and asked Mr. Vaughn whether he was okay or needed medical attention. Mr. Vaughn told the jailer he was "OK," and the jailer removed him from the room.

128. At approximately 12:53 p.m., Detention Officer Crowel went to the arraignment room to escort the detainees back to their cells. According to Officer Ham's supplement, Detention Officer Crowel "saw that Vaughn was shaking and sweating profusely."

129. Detention Officer Crowel asked Mr. Vaughn "several times" whether he needed medical attention, accepted Mr. Vaughn's refusal, and placed him alone in Cell 6.

130. Nothing in TCPD's reports indicates that any TCPD employee summoned EMS or any medical personnel at that time.

131. J.G. reported that, when he returned from court, he looked into Mr. Vaughn's cell and "observed him naked on the toilet."

132. J.G. reported that, after he was returned to his own cell, he began to hear "banging noises" coming from Mr. Vaughn's cell.

133. J.G. reported that a jailer checked on Mr. Vaughn "at least three times during that time frame."

134. At approximately 1:23 p.m., according to Officer Ham's supplement, Detention Officer Crowel saw Mr. Vaughn “on the toilet in his cell, still shaking and sweating,” asked again whether he needed medical attention, and again accepted a refusal.

135. At approximately 1:48 p.m., Detention Officer Crowel found Mr. Vaughn unresponsive and, for the first time recorded in TCPD's reports, requested EMS.

136. Texas City EMS transported Mr. Vaughn to Mainland Medical Center with CPR in progress. He was pronounced dead there shortly after 2:30 p.m.

137. Approximately fifty-five minutes passed between Detention Officer Crowel's first recorded observation that Mr. Vaughn was shaking and sweating profusely, at about 12:53 p.m., and his request for EMS at about 1:48 p.m.

138. In Custodial Death Report No. 20-213-MJ, amended and submitted to the Texas Office of the Attorney General on March 25, 2020, TCPD identified the cause of death as “acute methamphetamine toxicity,” citing Galveston County Medical Examiner's report No. ME-01-2020-086, and identified Chief Joe Stanton as the agency's director.

139. The same Custodial Death Report answered “No” to whether Mr. Vaughn appeared intoxicated, and “Yes” to whether he exhibited medical problems and whether he exhibited mental health problems.

140. The narrative of the Custodial Death Report reproduces Officer Ham's supplement, including Detention Officer Crowel's observations that Mr. Vaughn was “shaking and sweating profusely” and, later, “still shaking and sweating.”

141. On information and belief, TCPD did not adopt any new policy, training, or jail practice for recognizing and responding to signs of stimulant toxicity in detainees as a result of Mr. Vaughn's death.

***I. The Death of Derrick Dwayne Glenn (2024)***

142. Forty-three days after Mr. Ornelas's death, Derrick Dwayne Glenn died in Texas City Police Department custody following a pedestrian stop, after placing an object in his mouth. Texas City Fire Department paramedics later removed a baggie from his airway during resuscitation, after he had stopped breathing. The Medical Examiner determined the cause of death to be "Mechanical Obstruction of Airway by Foreign Body." The two matters share the same department.

143. According to the dispatch log, Sgt. Picard arrived on scene in the Glenn incident at 11:34 a.m., about four minutes after Officer Adams requested EMS. Sgt. Picard was a supervising officer in both incidents.

144. Officer R. Lizik appears in both records – in this matter, he was dispatched to the Biosphere and set out to retrieve the WRAP restraint device before officers disregarded it.

145. Investigator C. Ham, Badge No. 2443, wrote the 2020 supplement reporting Detention Officer Crowel's observations of Mr. Vaughn, and on December 11, 2024 wrote the crime-scene supplement in the Glenn matter.

146. Detective Jeffrey Winstead, who in 2020 recorded the detainees' accounts of Mr. Vaughn's symptoms, was the Detective Sergeant to whom Sgt. Picard reported Mr. Glenn's "medical emergency" on December 10, 2024, according to Detective

Sergeant Winstead's own supplement, and is listed as supervisor on the Glenn crime-scene supplement, which is marked "NOT REVIEWED."

147. Mr. Glenn's postmortem toxicology detected phencyclidine (PCP) and cocaine, and returned a presumptive, unconfirmed screen for naloxone.

148. In the Glenn incident, Officer Adams requested EMS at 11:30 a.m., about one minute after the stop. While officers waited, Mr. Glenn became unconscious and his breathing grew faint. After Officer Adams's initial attempt to remove the item from Mr. Glenn's mouth, the officers' reports record sternum rubs and the recovery position, and no further attempt to clear his airway. The dispatch log records that EMS began CPR at 11:43 a.m.

149. A related action arising from Mr. Glenn's death, *Estate of Derrick Dwayne Glenn, et al. v. City of Texas City, Texas, et al.*, is being filed concurrently with this action, as set forth in Paragraph 8 above.

## V. CLAIMS FOR RELIEF

**CLAIM I – Deliberate Indifference to Serious Medical Needs – Fourteenth Amendment, 42 U.S.C. § 1983 (*Against Moore, Parler, McInerney, Milillo, and Picard*)**

150. Plaintiffs repeat, reallege, and incorporate by reference each preceding paragraph as if fully set forth herein.

151. At all relevant times, Mr. Ornelas was a pretrial detainee in the custody of the Texas City Police Department.

152. Mr. Ornelas's continuous, unbroken convulsive movement, profuse sweating, and incoherence, sustained without any lucid or cooperative interval from his arrest through his cardiac arrest, constituted an objectively serious medical need.

153. Each Defendant named in this Claim had actual, subjective knowledge of facts from which an inference of substantial risk of serious harm to Mr. Ornelas could be drawn, and each Defendant in fact drew that inference.

154. Defendant Moore personally transported Mr. Ornelas while he was in continuous convulsive distress, admitted she failed to verify he was secured by a seatbelt, and left him alone and unattended in her vehicle while she stopped at the Texas City Police Department to secure her firearm.

155. Defendant Moore told jail staff, “I'd take him to get a FIT but I gotta wait for Cargile to bring the WRAP because he's gonna be throwin himself all over,” and waited for the restraint device.

156. Defendant Moore told the jail nurse Mr. Ornelas was “out of it like that” when she first observed him.

157. When Mr. Ornelas stopped moving and became unresponsive, Defendant Moore personally recognized and stated aloud to jail personnel, “He's coding.”

158. Defendant Parler personally observed Mr. Ornelas “drenched in sweat,” wrote that sweating is “a common side effect of narcotics,” and concluded that Mr. Ornelas was “a danger to himself or others.” Defendant McInerney recorded that Mr. Ornelas appeared “disoriented and intoxicated” and was “soaked in what is believed to be sweat.” Neither summoned EMS.

159. Defendant Milillo personally asked Mr. Ornelas whether he had taken anything and offered to summon EMS, then cleared the scene without further assessment once Mr. Ornelas denied it, notwithstanding Mr. Ornelas's ongoing visible distress.

160. Defendant Picard, informed by Officer Moore that the Galveston County Jail's own medical staff had refused intake and recommended a fitness-for-incarceration evaluation at a hospital 0.4 miles away, directed that Mr. Ornelas remain at the sally port until the WRAP restraint device arrived from Texas City, and did not summon EMS.

161. Each Defendant disregarded the risk to Mr. Ornelas by failing to take any reasonable measure to address it, including failing to summon emergency medical services, failing to direct transport to a hospital, and failing to render any first aid within the scope of their training.

162. Had Sgt. Picard directed Mr. Ornelas's transport to UTMB when the jail nurse first recommended it, rather than directing that he first await a restraint device, Mr. Ornelas would have arrived at a hospital emergency department during the approximately 23 minutes that elapsed before he stopped moving and became unresponsive – time during which active cooling and supportive care, the standard treatment for acute methamphetamine toxidrome with severe hyperthermia, could have been administered. On information and belief, but for this delay, Mr. Ornelas would not have died, or his chances of survival would have been materially improved.

163. This causal link is corroborated by the City's own Risk Analysis Board, which reviewed this incident and concluded, in writing, that "EMS should have been called or Transported to Local Hospital."

164. This causal link is further corroborated by EMS's own patient care record, which documents that Mr. Ornelas achieved return of spontaneous circulation during resuscitation efforts – direct, contemporaneous medical evidence that his condition remained responsive to treatment, and that the opportunity for a life-saving intervention had not yet closed by the time any medical care was finally administered.

165. Had Defendant Moore, having herself recognized that Mr. Ornelas needed a fitness-for-incarceration evaluation, summoned EMS or transported him to UTMB rather than waiting for the WRAP device and standing by as he continued to deteriorate, Mr. Ornelas would have received emergency medical intervention during the same critical window described above. On information and belief, but for this delay, Mr. Ornelas would not have died, or his chances of survival would have been materially improved, for the same reasons set forth above.

166. Each Defendant's deliberate indifference was a proximate cause of Mr. Ornelas's death.

167. Each Defendant acted under color of state law at all relevant times.

168. The right of a pretrial detainee to be free from deliberate indifference to his serious medical needs was clearly established on October 28, 2024.

169. In the alternative, to the extent any of the conduct described above occurred during an ongoing seizure governed by the Fourth Amendment, the same facts state a claim for objectively unreasonable denial of medical care in violation of the Fourth Amendment.

**CLAIM II – Municipal Liability – Fourteenth Amendment, 42 U.S.C. § 1983 (*Against the City of Texas City*)**

170. Plaintiffs repeat, reallege, and incorporate by reference each preceding paragraph as if fully set forth herein.

171. The violations of Mr. Ornelas's constitutional rights described in Claim I were caused by official policies and customs of the City of Texas City, adopted and maintained with deliberate indifference to the rights of persons in TCPD custody.

172. The City's final policymaker for TCPD policy, training, and internal review is the Chief of Police, acting under authority delegated by the City Commission, and, to the extent that authority was not delegated, the City Commission itself.

173. At all relevant times, Defendants Moore, Parler, McInerney, Milillo, and Picard acted within the course and scope of their employment with the City.

174. At least three people died in TCPD custody between February 2020 and December 2024: Raven Vaughn on February 11, 2020; Mr. Ornelas on October 28, 2024; and Derrick Dwayne Glenn on December 10, 2024.

175. Mr. Vaughn and Mr. Ornelas died of the same cause, toxic effects of methamphetamine, as determined by the Galveston County Medical Examiner in Case Nos. ME-01-2020-086 and ME-01-2024-826.

176. Mr. Glenn died of mechanical obstruction of the airway by a foreign body after Officer Adams saw him place an object in his mouth. Galveston County Medical Examiner Case No. ME-01-2024-958.

177. In each death, TCPD personnel observed visible and worsening signs of a medical emergency while the detainee was in TCPD's custody: Mr. Vaughn shaking and sweating profusely for nearly an hour; Mr. Ornelas sweating profusely, incoherent, and in continuous involuntary convulsive movement for approximately one hour; and Mr. Glenn laboring to breathe and then losing consciousness over fourteen minutes.

178. In each death, TCPD personnel had reason to suspect that the detainee had taken a substance. Mr. Glenn was seen placing an object in his mouth. Mr. Ornelas told three officers that someone had given him something earlier. Mr. Vaughn was arrested with pills that Officer Hansen believed to be ecstasy and that produced a positive result on a Nark II methamphetamine/MDMA field test.

179. In Mr. Vaughn's and Mr. Ornelas's deaths, TCPD personnel asked the detainee whether he needed medical attention or had taken anything and treated the answer as the end of the inquiry. Mr. Vaughn declined medical attention twice. Mr. Ornelas told Officer Parler that "they gave me something," and later told Officer Milillo that he had not taken anything. In neither case did any TCPD employee summon EMS while the detainee was still conscious.

180. In each death, the first decisions TCPD personnel made about the detainee were custody decisions: to hold Mr. Vaughn in a cell, to transport Mr. Ornelas to jail and then to await a restraint device, and to question and search Mr. Glenn.

181. **Absence of policy and failure to train.** The City maintained no policy and provided no training directing TCPD officers and jail personnel (a) to recognize the signs of acute stimulant toxicity, including profuse sweating, shaking or convulsive movement, flushed skin, dilated pupils, labored breathing, agitation, and impaired communication, as a medical emergency; (b) to treat a detainee who may have taken or ingested a substance as at risk of a medical emergency regardless of the detainee's denial or refusal of help; and (c) to summon emergency medical services or arrange hospital transport, rather than holding the detainee in a cell or awaiting a restraint device. This is confirmed by Defendant Moore's own admission to EMS personnel on scene, in which she stated she did not know what overdose symptoms looked like and that this was her first time encountering one. The need for such a policy and training was obvious in light of the frequency with which TCPD officers encounter persons who are intoxicated or in medical crisis at arrest, and the highly predictable consequence of its absence was that a detainee in Mr. Ornelas's position would die while officers deferred to a restraint device rather than to medical care. The need was made plain to the City by Mr. Vaughn's death in 2020.

182. **Custom.** The City's actual practice, as reflected in the deaths of Mr. Vaughn in February 2020, Mr. Ornelas in October 2024, and Mr. Glenn in December 2024, in the dispatch coding of the Ornelas event as a non-medical “suspicious person” call

that was never reclassified, and in the involvement of the same supervising sergeant in both 2024 deaths, was to treat a detainee's visible medical crisis, particularly one following suspected substance ingestion or intoxication, as a matter of custody and investigation rather than medical care, and to defer medical assessment and intervention until the detainee was unresponsive or EMS was summoned by someone else. That practice persisted over a period of more than four years and was so common and well settled among TCPD personnel as to constitute a custom that fairly represents municipal policy.

183. The Vaughn and Ornelas deaths are similar in the respects that matter. Each involved a detainee in TCPD custody, visible profuse sweating recorded by TCPD's own personnel, a suspicion of drug use, no summons for emergency care while the detainee was conscious, and a death from the same cause, toxic effects of methamphetamine.

184. **Policymaker knowledge.** The City's Chief of Police had notice of the Vaughn death no later than March 25, 2020, when the City submitted its amended Custodial Death Report to the Office of the Attorney General, naming Chief Joe Stanton as director and reciting the cause of death as acute methamphetamine toxicity. The report's narrative recorded Detention Officer Crowel's observation that Mr. Vaughn was “shaking and sweating profusely.” On December 12, 2024, TCPD Assistant Chief Manuel Johnson submitted the City's Custodial Death Report for Mr. Ornelas to the Office of the Attorney General, naming Chief Landis Cravens as the agency director. In that report the City stated that Mr. Ornelas had exhibited medical

problems, had appeared intoxicated, was under restraint by handcuffs, and "was denied entry during booking and jail staff advised he required a medical fit for incarceration," and that "[w]hile the male was being returned to the patrol unit a medical episode happened." On June 17, 2025, the City's Risk Analysis Board found that conduct to be no violation of policy while acknowledging, in writing, that EMS should have been called or the detainee taken to a hospital. That finding was transmitted to the Chief of Police and, on information and belief, was not overruled and produced no change in policy or training. The City therefore had notice in 2020 that a detainee in methamphetamine toxicity can die in its custody after visible signs go unaddressed, and received the same lesson again in 2024. Its failure to adopt any policy or training requiring medical care for a detainee in crisis was the City's deliberate choice and not the oversight of an individual officer.

185. **Ratification.** On information and belief, Chief Cravens, as the City's final policymaker, approved the Risk Analysis Board's disposition, including its finding of no policy violation, with knowledge of the Board's written acknowledgment that "EMS should have been called OR suspect should have been taken to a local hospital prior to going to the jail," and thereby ratified the officers' conduct and the basis for it.

186. The City's absence of policy, failure to train, and custom described above were the moving force behind the officers' failure to recognize the signs of stimulant toxicity in Mr. Ornelas, to assess him, or to summon emergency medical care for him, and a proximate cause of his death.

**CLAIM III – Supervisory Liability – Fourteenth Amendment, 42 U.S.C. § 1983 (*Against Cravens*)**

187. Plaintiffs repeat, reallege, and incorporate by reference each preceding paragraph as if fully set forth herein.

188. At all relevant times, Defendant Cravens, as Chief of Police, was responsible for the policies, training, and supervision of TCPD officers and jail personnel, including their response to detainees in medical distress.

189. Defendant Cravens acted under color of state law at all relevant times.

190. Defendant Cravens did not adopt any policy, or provide or require any training, directing TCPD officers to summon emergency medical services or arrange hospital transport for a detainee showing signs of stimulant toxicity or other acute medical distress, as described in Claim II.

191. On information and belief, Defendant Cravens, who had served with TCPD for more than twenty years and as Assistant Chief under Chief Stanton, knew of Mr. Vaughn's death in the Texas City Jail in February 2020 and of the circumstances recorded in the City's Custodial Death Report for that death.

192. Defendant Cravens's failure to train and supervise TCPD officers in recognizing and responding to medical emergencies in custody was deliberately indifferent to the serious medical needs of detainees, including Mr. Ornelas.

193. That failure to train and supervise was a moving force behind the failure of Defendants Moore, Parler, McInerney, Milillo, and Picard to summon emergency medical care for Mr. Ornelas, and a proximate cause of his death.

194. On information and belief, Defendant Cravens reviewed and approved the Risk Analysis Board's June 17, 2025 disposition finding no policy violation, with knowledge of the Board's written acknowledgment that "EMS should have been called OR suspect should have been taken to a local hospital prior to going to the jail," and took no corrective action.

195. The right of a pretrial detainee to be free from deliberate indifference to his serious medical needs, including through a supervisor's deliberately indifferent failure to train and supervise, was clearly established on October 28, 2024.

## VI. DAMAGES

196. Plaintiffs repeat, reallege, and incorporate by reference each preceding paragraph as if fully set forth herein.

197. Because 42 U.S.C. § 1983 does not itself specify the parties who may recover, or the measure of recovery, when a constitutional violation results in death, 42 U.S.C. § 1988(a) directs the Court to apply the law of the forum State to the extent it is not inconsistent with federal law. The Fifth Circuit applies the Texas Wrongful Death Act and the Texas Survival Statute to determine who may recover, and what damages may be recovered, for a death caused by a violation of § 1983. *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 390–91 (5th Cir. 1992); *see also Brazier v. Cherry*, 293 F.2d 401, 405–09 (5th Cir. 1961).

198. Mr. Ornelas's death was caused by the acts and omissions of Defendants alleged above. Had he lived, Mr. Ornelas would have been entitled to bring an action under 42 U.S.C. § 1983 for those acts and omissions.

199. Under Texas Civil Practice and Remedies Code § 71.021, Mr. Ornelas's cause of action survives his death, and the Estate of Rego Berto Ornelas Jr., by and through N.J.O., seeks the damages he could have recovered, including his conscious physical pain, mental anguish, and fear before death, funeral and burial expenses, and exemplary damages.

200. Under Texas Civil Practice and Remedies Code §§ 71.002 through 71.004, Plaintiffs Rachel Ornelas and N.J.O., as Mr. Ornelas's statutory wrongful death beneficiaries, seek, individually and for the benefit of all statutory beneficiaries, including Mr. Ornelas's father, Rego Berto Ornelas Sr., who is not a party, the damages resulting from his death, including pecuniary loss, loss of companionship and society, and mental anguish. N.J.O. additionally seeks damages for the loss of her father's parental guidance, care, and nurture.

201. **Exemplary damages.** The conduct of Defendants Cravens, Moore, Parler, McInerney, Milillo, and Picard described above was undertaken with reckless and callous indifference to Mr. Ornelas's federally protected rights, entitling Plaintiffs to an award of exemplary damages against each of them in his or her individual capacity under 42 U.S.C. § 1983. No exemplary damages are sought against the City. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 269, 271 (1981).

## VII. <u>ATTORNEYS' FEES</u>

202. Plaintiffs are entitled to recover their reasonable attorneys' fees, expert fees, and costs under 42 U.S.C. § 1988(b) and (c).

## VIII. JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable under Federal Rule of Civil Procedure 38(b).

## IX. REQUEST FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that Defendants be cited to appear and answer, and that upon final trial Plaintiffs have judgment against Defendants for:

a. compensatory damages on behalf of the Estate of Rego Berto Ornelas Jr., for Mr. Ornelas's conscious pain and suffering, mental anguish, fear before death, medical expenses, and funeral and burial expenses;

b. compensatory damages on behalf of Rachel Ornelas and N.J.O. for loss of companionship and society, mental anguish, and loss of pecuniary support;

c. exemplary damages against Defendants Cravens, Moore, Parler, McInerney, Milillo, and Picard in their individual capacities;

d. reasonable attorneys' fees, expert fees, and costs under 42 U.S.C. § 1988;

e. pre-judgment and post-judgment interest at the highest rates allowed by law;

f. costs of court; and

g. such other and further relief, at law or in equity, to which Plaintiffs may show themselves justly entitled.

Date: October 26, 2026

Respectfully submitted,


*/s/ Courtney A. Vincent*
**Courtney A. Vincent**
Minnesota Bar No.: 0403083
SDTX Bar No.: 3746531
***Vincent Civil Rights – a Division of Vincent Law, PLLC***
1035 Dairy Ashford, Suite 145
Houston, Texas 77079
**Mailing Address:**
P.O. Box 940129
Houston, Texas 77094
Tel: (713) 223-9300
Fax: (832) 603-4444
**info@vincentlawpllc.com**

*/s/ Adalberto E. Ruiz*
**Adalberto E. Ruiz**
Texas Bar No.: 24071767
SDTX Bar No.: 2925292
***Ruiz Law Firm, PLLC***
3718 E. Broadway St.
Pearland, Texas 77581
Tel: (713) 234-7894
Fax: (832) 408-8540
**alberto@ruizlawyer.com**


**ATTORNEYS FOR PLAINTIFFS**